**BURSOR & FISHER, P.A.**
Stefan Bogdanovich (State Bar No. 324525)
Brittany S. Scott (State Bar No. 327132)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: sbogdanovich@bursor.com
         bscott@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
E-Mail: pfraietta@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALVIN LINCOLN, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| MX TECHNOLOGIES, INC., | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Calvin Lincoln brings this action on behalf of himself, and all others similarly situated against MX Technologies, Inc. ("Defendant" or "MX").  The following allegations are based on his counsel's investigation and upon information and belief, except for allegations concerning Plaintiff himself, which are based on personal knowledge.

### NATURE OF THE ACTION

1.     Defendant MX is a criminal enterprise that mimics various national and regional banks, tricking financial technology ("FinTech") application users into giving MX their bank account usernames and passwords.  MX designs fake login pages on FinTech applications.  These login pages use counterfeit bank trademarks and cyberpirated URLs to impersonate banks and trick app users into giving away their bank account usernames and passwords.  Figures 1 and 2, below, are different login screens allowing users to link their bank accounts to the FinTech application CountAbout.  Figure 1 is a *real* Chase website reached via a "private and secure" OAuth connection that transmits data only to Chase.   Figure 2, on the other hand, is a ***fake*** TD Bank login screen ***designed by MX to transmit usernames and passwords to MX, not TD Bank***.

| **Figure 1** | **Figure 2** |
|---|---|



2.     While both login screens above show a bank URL, only one of these websites is directly transmitting information to the referenced bank.  In Figure 1, the user is using a secure connection to the chase.com website and giving ***only*** Chase his or her bank account password.  In

1    Figure 2, in contrast, the user is not connected to https://www.td.com, as the screen shows.

2    Instead,  as shown through a browser's developer tools on Figures 3 and 4, below, the website

3    source is actually from the https://moneydesktop.com/ domain, which is owned and operated by

4    MX.[1]  These screenshots show that the user is actually giving his or her bank account username

5    and password to MX, *not* TD Bank.  Then, behind the scenes, MX separately logins to TD Bank on

6    the users' behalf, and links the TD Bank account to the FinTech application.  But MX keeps the

7    username and password for its own ulterior motive.

**Figure 3**



**Figure 4**

22    3.    MX's motive is simple.  MX is hired by FinTech companies to link users' bank

23    accounts to their proprietary websites and smartphone applications.  In other words, MX is hired to

24    be a digital mailman, *i.e.* send packets of information from the FinTech app to the bank website.

25    But being *just* a mailman doesn't pay well.  Being the mailman who opens the mail, reads it, and

26    _____

27    [1] The full URL source depicted on Figures 3-4 is:
     https://widgets.moneydesktop.com/md/connect/bf6vgrgvp0ds73ycj5b599fAy…xfc2NoZW1lIjoiY

28    XRyaXVtIiwiY3VycmVudF9pbnN0aXR1dGlvbl9jb2RlIjoidGRfYmFuayJ9.

sells financial intelligence reports on potential creditors and high net-worth individuals, on the other hand, pays very well.  To build these reports, MX wants 24/7, unlimited permissions and access to users' accounts.  And for that, MX needs usernames and passwords.  So instead of just linking bank accounts between the FinTech apps and the banks, MX deceptively and surreptitiously seeks out users' bank login credentials by impersonating the banks itself.

4.    Once MX obtains a user's bank account login credentials, it trawls through all that user's financial transactions, aggregates and analyzes this data, and, in MX's own words, "create[s] a profile about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes."[2]  "[T]he financial transactions of the external account… is shared with our clients [the FinTech apps, and potential other third-party banks] and also used by us on behalf of our clients in the aggregate to customize promotional offers for financial products."[3]  "These processing activities are key to our business value."[4]

5.    MX's self-described "processing activities"—"disguising a website URL… to convince you that you are interacting with a trusted source"— is classified as a "spoofing technique" by the Federal Bureau of Investigation.[5]  The Bureau warns Americans that "[p]hishing schemes often use spoofing techniques to lure you in and get you to take the bait.  These scams are designed to trick you into giving information to criminals that they shouldn't have access to."  In the financial industry, phishing schemes by data aggregators like MX are euphemistically called "screen scraping."  MX admits that screen scraping allows it to "connect ***without having an official relationship with the financial institutions*** [it] scrape[s] data from."[6]  As a Medium article

---

[2] MX Technologies, Inc., *Privacy Policy* (Apr. 6, 2022), https://www.mx.com/privacy-policy/; https://web.archive.org/web/20220926195316/https://www.mx.com/privacy-policy/.

[3] *Id*.

[4] *Id*.

[5] Federal Bureau of Investigation, *Common Scams and Crimes, Spoofing and Phishing*, https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/spoofing-and-phishing

[6] MX Technologies Inc., *The Ultimate Guide to Fintech Data*, https://www.mx.com/guides/fintech-data/.

emphasizes: "Screen Scraping is a data-access method that logs into your bank using your personal banking username and password *as if they were you*!"[7]  In other words, not only does MX pretend to be the bank in front of customers, but it also pretends to be customers in front of banks.  MX laments that "screen scraping… has become a dirty term in some circles [because] financial institutions aren't always aware of who is scraping their data or for what end."[8]

6.　　For many obvious reasons, banks hate screen scraping.  Multiple banks have accused screen scraping data aggregators like MX of peddling counterfeit financial services and sued them for trademark infringement and various other Lanham Act violations.[9]  The nation's biggest banks have spent years developing software to try to eliminate screen scraping.[10][11]  For large banks that successfully interrupt and catch MX's screen scraping, MX is relegated to just linking the accounts via a secure OAuth method.  *See e.g*., Figure 1.  Yet smaller banks with less resources cannot stop MX's screen scrapping themselves.  In response, groups of banks and FinTech companies have tried to set up a Financial Data Exchange to allow them to integrate accounts "without having to spoof web logins."[12]  Similarly, a group of eight bank trade

---

[7] Deepa Bhat, Medium, *Screen Scraping vs. API—10 Questions to Understand the Differences* (Oct. 11, 2018),  https://medium.com/yapily/screen-scraping-vs-api-10-questions-to-understand-the-differences-dc63fe19e3ed.

[8] MX Technologies, Inc., *Screen Scraping vs. Bank APIs; What's The Difference*, https://www.mx.com/blog/screen-scraping-vs-bank-apis-whats-the-difference/.

[9] *See, e.g*., *The PNC Financial Services Group, Inc. v. Plaid Inc*., 2:20-cv-01977-MRH (W.D. Pa.); *The Toronto-Dominion Bank v. Plaid Inc*., 1:20-cv-14424-RMB-MJS (D. N.J.).

[10] American Banker, *BofA, Chase, Wells Fargo pilot service to rein in screen scraping* (Jan. 26, 2021), https://www.americanbanker.com/news/bofa-chase-wells-fargo-pilot-service-to-rein-in-screen-scraping.

[11] American Banker, *JPMorgan Chase says it has fully eliminated screen scraping* (Oct. 6, 2022), https://www.americanbanker.com/news/jpmorgan-chase-says-it-has-fully-eliminated-screen-scraping.

[12] Benjamin Pimintel, Protocol, *Banks and fintechs agree: It's time for screen scraping to go. So what's next?* (Oct. 5, 2021), https://www.protocol.com/fintech/fdx-financial-data.

associations petitioned the Consumer Finance Protection Bureau to regulate data aggregators like MX.[13]

7.      These bank trade associations note in their petition that "[i]t is estimated that data aggregators [like MX] hold the consumer login credentials for tens of millions of customers… many of [whom] are unaware of the activities in which these intermediaries [like MX] engage, how the information is being collected, and how the data may be used or shared."[14]  Worse yet, a December 2021 consumer survey report on data privacy and financial app usage found that 73% of consumer respondents were unaware that FinTech companies have access to their bank account username and password, and 78% did not know that data aggregators like MX regularly access personal data even when their app is closed or deleted.[15]

8.      This is deception by design.  As Figure 2 demonstrates, MX intentionally misappropriates bank trademarks and URLs to lure consumers into believing they are interacting with the actual banks themselves.  Using these counterfeit marks and cyberpirated URLs, MX is able to trick FinTech app users to turn over their incredibly sensitive bank account credentials. Worse yet, MX never discloses this surreptitious data collection to consumers.  A link to MX's privacy policy or terms of use does not appear anywhere on the fake login screens it designs.  And if even they did, neither MX nor the FinTech companies disclose in their terms of use or their privacy policies that a user's bank account usernames and passwords are collected.

9.      Worse yet, such data collection is a huge threat to individuals' privacy.  A dozen U.S. Senators called on the Federal Trade Commission ("FTC") to "investigate widespread privacy violations by companies [like MX]… that are selling private data about millions of Americans

---

[13] American Bankers Association, *Letters to Congress and Regulators*, https://www.aba.com/-/media/documents/letters-to-congress-and-regulators/petition-to-cfpb-for-larger-participant-rulemaking-080222.pdf?rev=c0674598829b40808a179b1f4942b591.

[14] *Id.* at 5.

[15] The Clearing House, *2021 Consumer Survey: Data Privacy and Financial App Usage* (Dec. 2021), available at https://www.theclearinghouse.org/connected-banking/consumer-research.

collected without their knowledge or consent."[16]  They caution that "[c]onsumers' credit and debit card transactions can reveal information about their health, sexuality, religion, political views, and many other personal details."[17]

10.    For these reasons, Plaintiff Calvin Lincoln seeks relief in this action individually, and on behalf of all individuals whose bank account usernames and passwords were collected by MX for violations of the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), with the predicate criminal violation of trafficking banking and financial services using counterfeit marks under 18 U.S.C. § 2320.  Plaintiff Calvin Lincoln also seeks relief on behalf of a subclass of Californian residents for violations California's Anti-Phishing Act, Cal. Bus. & Prof. Code § 22947.2, *et seq*.  Through this action, Plaintiff seeks to enjoin MX Technologies from its deceptive data collection practices, and seeks to obtain actual and statutory damages, restitution, injunctive relief, and reasonable attorneys' costs and fees.

## JURISDICTION AND VENUE

11.    This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 over the claims that arise under the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c).

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different from Defendant.

13.    This Court has personal jurisdiction over Defendant because Defendant conducts substantial business within California such that Defendant has significant, continuous, and pervasive contacts with the State of California.

---

[16] Letter from Sen. Ron Wyden et al., Cong. of the U.S., to Joseph J. Simons, Chairman, Fed. Trade Comm'n (July 31, 2020), https://www.wyden.senate.gov/imo/media/doc/073120%20Wyden%20Cassidy%20Led%20FTC%20Investigation%20letter.pdf .

[17] *Id.*

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

## PARTIES

15.     Plaintiff Calvin Lincoln is a resident of Stockton, California.  Mr. Lincoln downloaded the Lexington Law app on his smartphone and linked his Patelco Credit Union bank account to the app.  While on the app, he was presented with a fake login screen designed by Defendant MX Technologies, Inc., which featured the Patelco Credit Union trademark and URL.  On this fake login page, he input his Patelco Credit Union bank account username and password, believing he was interacting with Patelco Credit Union.  Mr. Lincoln did not realize he was giving away his sensitive financial information to MX Technologies, Inc.  A example of this fake Patelco login page is reproduced below.  *See* Figure 5.



**Figure 5**

16.     Defendant MX Technologies, Inc., is a Delaware corporation with its principal place of business in Lehi, Utah.   MX is a software-as-a-service company that is hired by FinTech companies to link users' bank accounts to their proprietary apps and websites.

1

## RELEVANT FACTUAL ALLEGATIONS

2

    **A.**    **MX Collects and Sells Insights on Individual's Financial Data**

3

    17.    MX's clients are primarily FinTech companies that provide credit monitoring[18],

4

financial wellness[19], and payment processing to consumers through smartphone applications and

5

websites.  MX designs and provides the software used to link FinTech applications to those

6

consumers' bank accounts.

7

    18.    But MX collects users' login credentials for purposes that far exceed the disclosed

8

scope in at least three ways.  *First*, MX uses those credentials without any regard for what is

9

needed to "help [the user's] connect your financial accounts to apps."  *See* Figure 6, below.

10

Rather, MX acquires massive quantities of data for its own purposes.  *Second*, Defendant then

11

retains the usernames and passwords to "refresh" individuals' account information on an ongoing

12

basis, whether or not the individual uses the FinTech app on a given day.  Indeed, even if the user

13

never uses the app again, MX continues to collect data from their accounts on an ongoing basis.

14

*Third*, MX sells this data as part of large compilations of individual transactions that remain

15

traceable to particular individuals.  Nowhere does the user give either the FinTech company or MX

16

permission to do any of this.

17

    19.    This undisclosed second line of business—collecting and selling those FinTech app

18

users' sensitive financial data and insights derived from that data to those same FinTech app and

19

other financial industry companies who wish to purchase them—is MX's real cash cow.  It is "key

20

to [its] business value."[20]

21

    20.    When speaking to its actual clients, the FinTech companies and rival banks, MX

22

boasts that it provides clients "with enhanced data that goes beyond traditional credit scores,

23

organizations can better understand a consumer's complete financial picture, which reduces

24

25

---

[18] *E.g.*, https://www.lexingtonlaw.com/.

26

[19] *E.g.*, https://countabout.com/.

27

[20] MX Technologies, Inc., *Privacy Policy* (Apr. 6, 2022), https://www.mx.com/privacy-policy/;

28

https://web.archive.org/web/20220926195316/https://www.mx.com/privacy-policy/.

---

1    lending risks."[21]  MX's data "enables organizations to uncover new revenue streams."[22]  It even

2    shows how it transforms raw bank account data into "actionable data to drive... new innovations.

3    *See* Figure 6, next page.



**Figure 6**

21.    But MX also has a third-line of business—running a ***protection racket***.  Instead of

waiting for MX to steal usernames and passwords, banks can alternatively pay MX to set up a

private and secure "OAuth" connection with their customers.[23]  MX says this ensures that

"Consumers never have to share their username and password", and "can connect to and share their

financial data on their terms with permissioned data sharing and a consent dashboard to manage

and revoke access at any time."[24]  By implication, this means that when banks ***do not*** wet MX's

beak, financial data is shared ***without their customers' permission*** and that MX's bank account

---

[21] MX Technologies, Inc., *Data Access*, https://www.mx.com/products/data-access/.

[22] *Id.*

[23] *Id.*

[24] *Id.*

1  ***access cannot be revoked***.  Better yet, by paying MX its protection money, banks "can better

2  monitor and manage what data is leaving their platform."  It is an offer banks cannot refuse.

   **B.    MX Deliberatively Deceives Consumers with Counterfeit Marks,**
         **Fake URLs, Half-Truths, Dark Patterns, And an Unintelligible**
         **Privacy Policy.**

5      22.    A December 2021 consumer survey report on data privacy and financial app usage

6  found that a staggering 80% of consumer respondents are largely unaware that their FinTech apps

7  use data aggregators like MX to gather data, that 73% of respondents are unaware that MX and the

8  FinTech apps have access to their bank account usernames and passwords, and that 78% of

9  respondents did not know that aggregators like MX regularly access their personal data even when

10 the FinTech app is closed or deleted.  In MX's case, such deception is by design.

11     23.    As noted, the two most obvious points of deception are MX's use of counterfeit

12 marks and cyberpiracy bank URLs on the login screens themselves.  Most app users will simply

13 turn over their usernames and passwords falsely believing they are directly interfacing with the

14 bank itself.  Indeed, the only indication that MX plays any role on the login screens is a small link

15 at the bottom which says, "Data access by MX."  *See* Figure 7, next page.  This language is vague

16 and misleading.  And for the rare user that clicks on this phrase, the screen changes to another that

17 says, "Your app trusts MX to ***connect*** your [bank] account."  *See* Figure 8, next page.  Yet the

18 "data access by MX" does not refer to MX ***connecting*** a user's bank account.  Rather, the data

19 access is the provision of a user's bank account username and password, so that that MX has

20 unlimited access to the user's bank account, whenever it wants.

**Figure 7**



**Figure 8**

24.     Nowhere on Figure 8 does MX disclose it is a financial data analysis broker.  In fact, everything MX says on Figure 8 is meant to suggest the opposite.

25.     The top of the page shows a graphic of a cellphone, MX, and the counterfeit bank trademark.  The first sentence then says "Your app trusts MX to ***connect*** your [bank] account."  This is misleadingly implies that MX's role is that of an intermediary—*i.e.* a digital mailman—that merely "connects" a users' bank account to the smartphone app.

26.     MX's other representations in Figure 8 are false and misleading as well.  MX states it "MX doesn't sell your info."  But in its privacy policy, MX admits that "process[es] personal data… on behalf of our clients to perform our contractual obligations under our service agreements."[25]  Sharing "process[ed] personal data" under a contract is "sell[ing] your info."  And MX uses definitional gymnastics to lie to users about how and why it collects their most sensitive financial information.

---

[25] MX Technologies, Inc., *Privacy Policy* (Apr. 6, 2022), https://www.mx.com/privacy-policy/; https://web.archive.org/web/20220926195316/https://www.mx.com/privacy-policy/.

27.     Figure 8 also states that "MX will allow your app to access only the data requested." But MX's vague privacy policy suggests otherwise.  MX admits "[t]he data analysis can be extended to financial transactions obtained from external accounts, which is those outside of the financial institution hosting the software."[26]  Worse yet, MX's privacy policy seems to suggest that it shares users bank account usernames and passwords to the FinTech companies it is installed on: "[W]here a client's customer accesses our software and provides personal data for the purpose of aggregating data from external accounts, that data is shared with and accessible to the client."[27]

28.     Yet MX's most misleading half-truth is the claim that users "can stop sharing their info at any time."  Figure 8.  Once a user shares their bank account usernames and passwords with MX, the damage is done.  MX can access their bank accounts whenever it wants.  And if MX shares this information with other FinTech companies, they can too.  So, while it literally true that a user can conceivably stop sharing their info—by changing their bank account password—in practice, users have no reason to do so.  After all, MX never tells them it has their bank account username and password in the first place.

29.     Worse yet, a consumer could not even request that MX delete his or her bank account credentials.  MX's privacy policy only gives third-party FinTech app users the option to opt-out of internet tracking cookies.[28]  Its privacy policy does not allow app users the ability opt-out of MX's bank account credential collection, and cannot request MX to delete this information.[29]

30.     All of MX's representations in Figure 6 are misleading and designed to lure FinTech apps users into a false sense of security.  They obfuscate the true nature of MX's data collection practices and keep users in dark.

31.     This is a design decision.  MX's success in tricking people to hand over their sensitive bank account information is directly attributable to its use of "dark patterns."  A dark

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

pattern is "a user interface carefully crafted to trick users into doing things they might not otherwise do."[30] The FTC warns that "sophisticated design practices known as 'dark patterns' that can trick or manipulate consumers into… giving up their privacy."[31]

32.    The dark pattern MX uses most often is "misdirection."[32] The fake login screens are a prime example. The counterfeit bank trademarks and bank URLs at the top of the screen is made to draw the consumers' attention away from MX's own smaller reference at the bottom of the page. Figures 2, 5. This is obviously meant to confuse consumers into believing they are interacting with the bank and to turn over their username and password. Indeed, this form of trademark misdirection has long been recognized at common law and codified in the Lanham Act.

33.    If a sleuthing customer does click on "data access by MX," only more misdirection follows. The graphic of a cellphone, MX, and the counterfeit bank trademark and the first sentence, "**Your app trusts MX to connect your [bank] account**" is the meant to draw the user's attention. A user's eyes are then next drawn to the bolded headings "**Connect in seconds**" (along with an image of a linked chain) and "**Private and secure**" (along with an image of a lock). These are all designed to downplay the importance of MX's privacy policy, which is not bolded, and located at the very bottom of the screen.

34.    At no point in any of this process is a user ever required to *agree* to MX's privacy policy. MX never states that by using its login screen a user must agree to the MX privacy policy. MX does not give users the ability to opt-out of MX's collection of bank account usernames and passwords. Better yet, because MX never discloses its collection of usernames and passwords, a user would never even feel the need to ask.

---

[30] *Dark patterns in UX: how designers should be responsible for their actions* (Apr. 15, 2018), https://uxdesign.cc/dark-patterns-in-ux-design-7009a83b233c  (quoting UX designer Harry Brignull (PhD Cognitive Science), who coined the term "Dark Patters" in August 2010).

[31] Federal Trade Commission, *FTC Report Shows Rise in Sophisticated Dark Patterns Designed to Trick and Trap Consumers* (Sept. 15, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/09/ftc-report-shows-rise-sophisticated-dark-patterns-designed-trick-trap-consumers.

[32] "Misdirection" is a type of dark pattern where a website's "design purposefully focuses [customers'] attention on one thing in order to distract [them] attention from another." https://www.darkpatterns.org/types-of-dark-pattern/misdirection .

35.     Yet even if a user does eventually click on MX's privacy policy, the user will likely leave less informed than before they entered.  The privacy policy never utters to the words "username", "password", or "credentials" and never utters the term "bank account."

36.     Instead, MX's privacy policy uses the catch-all term "Personal Data."  "'Personal Data' means any information relating to an identified or identifiable natural person."[33]  MX's definition is so exceedingly broad that is fails to inform the user of **what exactly** is being collected.  By MX's definition, Personal Data can mean things as sensitive as one's bank account password to things as innocuous as the color of one's car.  By disclosing that "We process personal data on behalf of our clients," MX can say everything and nothing at the same time.

37.     MX uses the term "Personal Data" a staggering 80 times throughout its privacy policy.

38.     The California Consumer Privacy Act also requires MX to disclose the categories of personal information they collect.  Cal. Civ. Code § 1798.110.  In response to these legal obligations, MX opens a Russian nesting doll of equally amorphous terms such as "Commercial information," (left undefined), "Identifiers" (also left undefined), and "personal information categories described in the California Customer Records Statute."  Legal researchers who visit Westlaw can discover that these "personal information categories" include categories as innocuous as a person's "physical characteristics or description" to categories as sensitive as person's "bank account number."  Cal. Civ. Code § 1798.80(e).  Below is a list of all the statutory categories:

- His or her name
- Signature
- Social security number
- Physical characteristics
- Description
- Address
- Telephone number

---

[33] MX Technologies, Inc., *Privacy Policy* (Apr. 6, 2022), https://www.mx.com/privacy-policy/; https://web.archive.org/web/20220926195316/https://www.mx.com/privacy-policy/.

- Passport number

- Driver's license

- State identification card number

- Insurance policy number

- Education

- Employment

- Employment history

- Bank account number

- Credit card number

- Debit card number

- Any other financial information

- Medical information

- Health insurance information.

Cal. Civ. Code § 1798.80(e).

39.     MX's reference to the California Customer Records Statute's categories only creates more questions.  Does MX actually collect every single one of these categories of personal information?  In other words, does MX actually collect a user's "signature" or "passport number"?  If so, how?  Does MX collect only some of these categories?  If so, which ones?  Does MX just collect and commoditize any information it can get its hands on?   If so, which categories of personal information can it get its hands on?

40.     In short, at no point does MX ever directly or intelligibly inform individuals that it collects their bank account username and password.

1

2

**C.**     **MX Traffics Counterfeit Trademarks to Trick People into Using Its Linking Service**

3

41.     MX's racket is selling counterfeited services.  To link users bank accounts on FinTech

4

apps—and get their bank account login credentials—it uses various bank trademarks to make people

5

believe it is either the bank, or a trusted partner of the bank.  It is not.  Below are various examples

6

of various counterfeit trademarks MX uses on fake login screens (Figures 9, 11, 14) compared with

7

the actual trademarks and their USPTO registration numbers (Figures 10, 12, 13, 15).

8

9

10

11

12

13

14

15

16

17

18



**Figure 9**



**Figure 10**

**Registration Number: 3041170**

**Registration Date: January 10, 2006**

19

20

21

22

23

24

25

26

27

28



**PNC Bank**
http://www.pnc.com/

**Enter your credentials**

Please be advised, multiple authorization codes may
need to be entered to allow you to connect to this
institution.

User ID

Password

**Continue**

**Back**

Data access by MX

**Figure 11**



**Figure 12**

**Registration Number: 2508843**

**Registration Date: November 20, 2001**



**Figure 13**

**Registration Number: 2665477**

**Registration Date: December 24, 2002**

**BMO Harris Bank**
https://www1.bmoharris.com/www/#/login

**Enter your credentials**

User ID

Password

**Continue**

**Back**

Forgot your password?

Forgot your username?

Data access by MX

**Figure 14**

**BMO 🔴 Harris Bank**

**Figure 15**

**Registration Number: 4254628**

**Registration Date: February 28, 2012**

42.    On information and belief, MX has not obtained a license to use any of these trademarks in commerce.

**D.**    **MX Deliberately Avoids Linking Bank Accounts Via "Private & Secure" Methods**

43.    As noted, many banks design software to try to catch and stop screen scrapers like MX from logging in to user accounts.  For many banks that MX knows it cannot log into because of their advanced phishing detection tools, MX simply links them the "Private and Secure" way—OAuth.  In MX's own words: "OAuth is a simple, secure, and standardized way to perform authentication without actually exchanging sensitive credentials like usernames and passwords."[34]

44.    OAuth is the industry-standard method of linking online accounts from one website or application to another.  OAuth "enables apps to obtain limited access (scopes) to a user's data ***without*** giving away a user's password."[35]  OAuth redirects a user from the FinTech app to the bank website, and once the user is on the bank's website, the user logs-in, and the bank's website directly asks whether user agrees to allow the bank to give the FinTech app certain permissions and access.  Once the user authorizes those specific permissions, the user is then redirected back to the FinTech app.  Through OAuth, a user can ***grant*** certain permissions from the requesting FinTech app, but ***deny*** other permissions, like the ability to make transactions or access to the bank account password.  What is more, through OAuth, a user can direct the bank to cut off access to the FinTech app at any time.

45.    OAuth is used not only in banking, but across the internet for other types of websites as well.  For example, if a user wants to integrate their Facebook and Twitter accounts, it must log in to Twitter to grant Facebook certain permissions to access his or her Twitter account.  A dialogue box using OAuth would look something like Figure 14.[36]

---

[34] MX Technologies, Inc., *OAuth Guide*, https://docs.mx.com/oauth/guides/introduction.

[35] Matt Raible, What the Heck is Oauth? OKTA (June 21, 2017), https://developer.okta.com/blog/2017/06/21/what-the-heck-is-oauth.

[36] *Id*.

1
2
3
4
5
6
7
8
9
10
11
12



**Figure 16**

13    46.    In Figure 16, the user was redirected from the Facebook website to the Twitter

14 website.  After logging in on the Twitter website, the user grants Facebook permission to update

15 her Twitter profile and even post to the user's Twitter account, but denies Facebook permission to

16 see the user's Twitter password.  Instead, the user provides her Twitter username and password

17 only to Twitter.  Twitter then sends a "token" to Facebook, essentially confirming to Facebook that

18 the user's login to Twitter was legitimate.  Scopes are one of the "central components" and perhaps

19 even "the first key aspect" of OAuth.

20    47.    The primary reason OAuth has become the industry standard authorization protocol

21 is its ability to provide access to an individual's data without disclosing that individual's password

22 to the third-party service requesting access.  More importantly, it gives users control over their own

23 information and how that information is shared.  But this hurts MX's bottom line.  So it does

24 everything in its power to avoid having to link accounts via OAuth.

25
26
27
28

48.    As MX notes, "some institutions *only* support OAuth, and you won't be able to authenticate using ordinary credentials" that it collects from FinTech app users using spoofing techniques.[37]  For websites that MX *knows* have implemented software to detect and stop MX's screen-scrapping, MX has different login screens that guide users through the OAuth process.




| **Figure 17** | **Figure 18** |

49.    As shown above, MX actually tells Chase bank users that MX will direct them to the Chase bank, that they will login to Chase and that "***login information is never shared,***" and once accounts are connected, MX will return them to the page to finish connecting.  Figure 15 (emphasis added).  MX explicitly notes in its screen that this OAuth linking process is "Private and Secure."  *Id.*  After the user clicks the "Continue" button, he or she is redirected to a secure Chase Bank website to provide their login credentials.  Figure 18.

50.    Chase has not paid MX any money for this OAuth service.  It has instead paid security teams large sums of money to implement advanced spoofing detection and authentication tools to stop companies like MX from impersonating bank customers.

51.    Other banks have instead decided to pay MX protection money.  Figure 19.

---

[37] MX Technologies, Inc., *OAuth Guide*, https://docs.mx.com/oauth/guides/introduction.



Figure 19

52.     For these banks, MX also offers OAuth.  *See, e.g.*, Figures 20 and 21.

Figure 20                                              Figure 21

53.     MX may still try to obtain users' credentials via spoofing even for some paying banks.  *See* Figure 22, next page.  But MX will at least offer the users a courtesy link to "Go to institution's website."  *Id.*  If users click on that button, then they can login via OAuth at that protection paying bank's website.  Figure 23, next page. Whether OAuth is the only option or just one option may depend on the amount of protection money paid to MX.

**Figure 22**          **Figure 23**

54.     For every other bank, MX creates fake login screens using counterfeit marks and cyberpirated URLs, without an option to sign in via OAuth.

**E.      <u>Bankers and Governments Warn That MX Poses a Danger to Consumers</u>**

55.     Back in April 2016, J.P. Morgan & Company Chairman and Chief Executive Officer Jamie Dimon expressed "extreme[] concern[]" about "aggregators" like MX for several reasons.[38]  First, he noted that "[f]ar more information is taken than the third party needs in order to do its job"; second, "[m]any third parties sell or trade information in a way [users] may not understand, and the third parties, quite often, are doing it for their own economic benefit – not for the customer's benefit"; and third, "[o]ften this is being done on a daily basis for years after the

---

[38] Jamie Dimon, *Letter to Shareholders*, (Apr. 6, 2016), https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/investor-relations/documents/2015-annualreport.pdf.

1    customer signed up for the services, which they may no longer be using."[39]  In March 2017, the

2    American Bankers Association  echoed these concerns to the CFPB.[40]

3        56.    In response, the CFPB promulgated consumer protection principles for data

4    aggregation by companies like MX on October 2017.[41]  One of these principles was "control and

5    informed consent."[42]  This was borne out of a concern that "Many stakeholders express concern

6    that consumers may not read or understand the terms presented in disclosures when they authorize

7    third-party access to their data.  As a result, some stakeholders assert that this might impede the

8    ability of consumers to be truly informed about how often their data are being accessed, how long

9    their data are being retained, whether the data presented to them are accurate or complete, with

10   whom their data are being shared, and the risks associated with sharing their data and account

11   credentials."[43]

12       57.    In January 2018, the European Union explicitly banned companies like MX from

13   screen scraping EU citizens by implementing its Second Payment Services Directive, which

14   required banks to create secure APIs like OAuth.[44]  Yet screen scraping persists in the United

15   States because it is wildly profitable for companies like MX.

16       58.    As the years wore on, these issues only worsened.  In 2020, a dozen U.S. Senators

17   asked the Federal Trade Commission ("FTC") to investigate privacy violations from data

18   aggregators like MX.[45]  Two years later, a consortium of eight bank trade groups petitioned the

---

[39] *Id.*

[40] Rob Morgan, Vice President, Emerging Technologies of American Bankers Association, *Letter Response to Request for Information Regarding Consumer Access to Financial Records Docket No.: CFPB-2016-0048* (Feb. 21, 2017), https://www.aba.com/-/media/documents/comment-letter/aba-comment-cfpb-data-aggregators.pdf?rev=a5603ffb382c49059ebab1dfda631abf.

[41] https://files.consumerfinance.gov/f/documents/cfpb_consumer-protection-principles_data-aggregation_stakeholder-insights.pdf.

[42] *Id.* at 5.

[43] *Id.* at 6.

[44] https://www.ecb.europa.eu/paym/intro/mip-online/2018/html/1803_revisedpsd.en.html.

[45] Letter from Sen. Ron Wyden et al., Cong. of the U.S., to Joseph J. Simons, Chairman, Fed. Trade Comm'n (July 31, 2020),

---

CFPB to regulate the activities of data aggregators like MX.[46]  However, to date, no single agency has been able to stop this practice.

**F.**  **Plaintiff And Class Members Are Harmed By a Loss of Indemnification, Property, and Privacy Rights, Are at Increased Risk of Identity Theft And Fraud, And Have Lost Control Over Their Private Information.**

59.  MX's actions harm Plaintiff in various ways.

60.  First, by unwittingly sharing his bank account credentials with MX, Plaintiff loses indemnification rights under federal banking regulations.  Under these regulations, a consumer's liability for unauthorized electronic fund transfers from his or her financial accounts is generally capped at $50.  *See, e.g.*, 12 C.F.R. §§ 1005.2(m) and 1005.6(b).  However, by giving MX their bank account credentials, consumers, like Plaintiff lose these federal indemnification rights.  So, if a rogue actor uses a consumers' credentials to access and improperly transfer funds from their accounts, the consumer's bank will consider that transfer to have been authorized because they initially gave the credentials away to MX.

61.  Thus, if the rogue actor transfers $10,000 from Plaintiff's account, instead of losing $50, Plaintiff will lose the full amount of the transferred funds.  By removing Plaintiff and Class members' data from their bank's secure environment and storing it in MX's own computer systems, networks or servers, MX destroys the rights and protections to which Plaintiff and Class members are otherwise entitled.  That amounts to an economic loss to Plaintiff and Class members.

62.  And even if a particular Plaintiff or Class member's account is not compromised, that individual still suffers a cognizable economic injury—the loss of this regulatory indemnification right.  That right has a real economic value that is akin to an insurance policy.  It is a quantifiable economic injury that is capable of being redressed.

---

https://www.wyden.senate.gov/imo/media/doc/073120%20Wyden%20Cassidy%20Led%20FTC%20Investigation%20letter.pdf .

[46] American Banker, *Banks ask CFPB to Crack Down on Data Aggregators*, https://www.americanbanker.com/news/banks-ask-cfpb-to-crack-down-on-data-aggregators.

63.     Second, there is an economic value to the financial data that MX collects, analyzes, and sells about Plaintiff and Class members.  The consumer data market has been valued at $200 billion.[47]  Plaintiff and Class members not only have an economic interest in their own information, but also possess a means of commoditizing it on their own terms.

64.     There are numerous companies that offer tools to allow individuals to monetize their own internet browsing data.[48][49]  For example, Brave is a web browser that allows consumers to surf the internet free of surveillance (unlike some other browsers), while offering the option to allow Brave to observe their activity and collect data in exchange for basic attention token ("BAT"), a currency that can be traded for approximately one dollar per BAT.[50]  Brave estimated in 2020 a user would be able to earn between $60 and $70 that year—and possibly over $200 in 2020—by selling access to their data through the Brave software.[51]  As of April 2023, there is over $400 million in BAT outstanding, with as much as $10 million worth of the currency traded per day.[52]

65.     Indeed, a company called Datacoup paid consumers up to $8 per month for access to, among other things, their credit card transaction data.  But Datacoup dissolved because it could not achieve the same scale as companies like MX, which harvests data from millions of consumers for free by using deceptive tactics.  As Forbes reported at the time, "The problem for such new companies is that marketers will not pay much for details about just thousands of people when data brokers who pay nothing to individuals offer detailed dossiers on millions."[53]  MX's unlawful

---

[47] Catherine Tucker, Harvard Business Review, *Buying Consumer Data? Tread Carefully* (May 1, 2020), https://hbr.org/2020/05/buying-consumer-data-tread-carefully.

[48] Lotame, https://www.lotame.com/how-to-monetize-your-data/.

[49] Brave, https://brave.com/.

[50] Michael Kan, PC Magazine, *Brave Browser Will Pay You to View Ads (But There's a Catch)*, (Jan. 15, 2019), https://www.pcmag.com/news/brave-browser-will-pay-you-to-view-ads-but-theres-a-catch.

[51] *Id.*

[52] Coincap.io Data Market Website (last visited April 17, 2023), https://coincap.io/.

[53] Adam Tanner, Forbes Magazine, *Others Take Your Data for Free, This Site Pays Cash* (March 3, 2019), https://www.forbes.com/sites/adamtanner/2014/03/03/others-take-your-data-for-free-this-site-pays-cash/?sh=5c62f4679461.

conduct is a substantial factor preventing the developing a market for Plaintiff and Class members to sell access to their data on their terms. MX has thus deprived consumers of the value of their data. This amounts to an economic loss of money to Plaintiff and Class members, which is also capable of quantification.

66. By stealing Plaintiff and Class members' data without their informed consent, MX impedes the possibility of a robust and equitable market for consumer data where Plaintiff and Class members could be compensated.

67. Plaintiff and Class members were thus deprived of the benefit of their bargain. Plaintiff and Class members agreed to use MX's bank account linking services based on MX's false and misleading representations MX was (1) actually the Plaintiff or Class member's bank, (2) merely an intermediary between the FinTech app and the bank, and (3) that MX would not sell Plaintiff and Class members information. However, *none* of these representations were true, and MX was unjustly enriched by collecting Plaintiff and Class members most sensitive financial information, creating "profiles" on individuals, and selling that for immense profit. Plaintiff and Class members' financial information is a valuable commodity, and they were tricked into giving it away for free because MX used counterfeit marks and cyberpirated URLs to make Plaintiff's and Class members believe they were interacting with the banks themselves.

68. Third, MX increases the risk that Plaintiff and Class members' accounts will be compromised. By collecting and aggregating Plaintiff and Class members' data, MX is an ideal target for hackers and identity thieves. What is more, MX collects and shares this data with other fourth, fifth, and sixth parties. These individuals also become targets for hackers and identity thieves. So, whereas before, a hacker could only obtain Plaintiff and Class members' financial data through either the users' or their banks themselves, MX has multiplied the number of targets for malicious actors. It is hard to keep a password secret between just two people. It is even harder to keep it secret with three or more people.

69. The increased risk of identity theft inflicts real economic costs on Plaintiff and Class members because it necessitates ongoing costly credit monitoring services.

70.     The increased risk of identity theft is also a monitoring cost borne by banks, that is passed down to Plaintiff and Class members in the form of higher bank fees and lower interest rates.  The Federal Reserve System, the Federal Deposit Insurance Corporation, and the Department of the Treasury proposed regulatory guidance to that banks, informing them they "should identify large-scale screen scraping activities [from actors like MX].  When identified, banks should take appropriate steps to identify the source of these activities and conduct appropriate due diligence to gain reasonable assurance of controls for managing this process. These efforts may include research to confirm ownership and understand business practices of the firms; direct communication to learn security and governance practices; review of independent audit reports and assessments; and ongoing monitoring of data-sharing activities."[54]

71.     Moreover, given the secret, undisclosed nature of Defendant's data collection practices, Plaintiff anticipate that discovery and expert analysis are likely to demonstrate additional types of economic loss or damage and/or damage to money and property and reserve their rights to amend this Complaint to assert those theories at the appropriate time.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

72.     The statutes of limitation applicable to Plaintiff and Class members' claims are tolled as a result of MX's knowing and active concealment of its conduct alleged herein.  Among other things, MX designs its software to deceive users into thinking that they are interacting directly with their banks when providing login credentials to facilitate a connection between their bank accounts and a third-party service.  MX also fail to disclose to each individual user—either through its own privacy policy, website, or other document—that it stores the bank login information provided in such login transactions and use those credentials to collect financial data from the individual's bank accounts on an ongoing basis, even though the individual never consented to such data collection.  Nor does Defendant inform each individual user that this data collection will continue even if the individual revokes the permissions granted to the third-party

---

[54] The Federal Reserve System, Docket No. OP-1752, *Proposed Intraagency Guidance on Third-Party Relationships: Risk Management* (July 12, 2021), at 66, https://www.fdic.gov/news/press-releases/2021/pr21061a.pdf.

service it sought to connect to her bank account.  By these actions, MX intentionally concealed the nature and extent of its data collection operation to maximize profits resulting from the sale of Plaintiff and Class members' highly sensitive financial information, to the extent the Plaintiff brings this matter on behalf of themselves and those similarly situated."

73.     Plaintiff and Class members could not, with due diligence, have discovered the full scope of MX's conduct, due to MX's deliberate efforts to conceal it.  All applicable statutes of limitation also have been tolled by operation of the discovery rule.  Under the circumstances, MX was under a duty to disclose the nature and significance of its data and privacy policies and practices but did not do so.  MX is therefore estopped from relying on any statute of limitations.

74.     Further, this Complaint alleges a continuing course of unlawful conduct by which MX has inflicted continuing and accumulating harm within the applicable statutes of limitations.

75.     Each time MX engaged in an unlawful act complained of here, MX undertook an overt act that has inflicted harm on Plaintiff and other members of the Classes.

76.     For these reasons, the statutes of limitations have been tolled with respect to the claims of Plaintiff and members of the Classes asserted in this Complaint.

77.     Defendant's fraudulent concealment and omissions are common to Plaintiff and all Class members.

## CLASS ACTION ALLEGATIONS

78.     Plaintiff brings this matter on behalf of themselves and those similarly situated in the following Classes:

> **Nationwide Class**: All natural persons in the United States whose accounts at a financial institution were accessed by MX using MX's software incorporated in a mobile or web-based FinTech app from 2014 to the present.

> **California Class**: All natural persons in the United States whose accounts at a financial institution were accessed by MX using MX's software incorporated in a mobile or web-based FinTech app from 2014 to the present.

79.     Excluded from each of the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest

and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

80.     The members of the Classes are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, such information can be ascertained through appropriate discovery, from records maintained by Defendant and its agents.

81.     Plaintiff reserves the right to expand, limit, modify, or amend the class definitions, including the addition of one or more subclasses, in connection with their motion for class certification, or at any other time, based on, inter alia, changing circumstances and new facts obtained.

82.     <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable.  Plaintiff believes that there are thousands of consumers who are Class Members described above who have been damaged by Defendant's Data Harvesting Policy.

83.     <u>Commonality</u>: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

> a.  Whether Defendant is responsible for the conduct alleged herein, which was solicit and induce Plaintiff and Class Members to provide identifying information by represent itself as being a financial institution without the authority or approval a that financial institution;
>
> b.  Whether Defendant's conduct was unlawful;
>
> c.  Whether Defendant's conduct violated Cal. Bus. & Prof. Code § 22948.2;
>
> d.  Whether Defendant's conduct violated 18 U.S.C. § 2320;
>
> e.  Whether Plaintiff and the Class members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement;
>
> f.  Whether Plaintiff and the Class members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief;

g.  Whether Plaintiff and the Class members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

84.  Typicality: Plaintiff Calvin Lincoln is a member of the Classes he seeks to represent.  Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same conduct and turned over their bank account usernames and passwords to Defendant.  Plaintiff is entitled to relief under the same causes of action as the other Class members.

85.  Adequacy: Plaintiff is an adequate Class representatives because their interests do not conflict with the interests of the Class members they seek to represent; their Credit Card Privacy Act claims are common to all other members of the Classes and they have a strong interest in vindicating their rights; they have retained counsel competent and experienced in complex class action litigation and they intend to vigorously prosecute this action.  Plaintiff has no interests which conflicts with those of the Classes.  The Class Members' interests will be fairly and adequately protected by Plaintiff and his counsel.  Defendant has acted in a manner generally applicable to the Classes, making relief appropriate with respect to Plaintiff and the Class Members.  The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications.

86.  Further, a class action is superior to any other available method for the fair and efficient adjudication of this controversy since individual joinder of all Class Members is impracticable.  Additionally, the expense and burden of individual litigation would make it difficult or impossible for the individual Class Members to redress the wrongs done to them, especially given the costs and risks of litigation as compared to the benefits that may be attained.  Even if the Class Members could afford individualized litigation, the cost to the court system would be substantial and individual actions would also present the potential for inconsistent or contradictory judgments.  By contrast, a class action presents fewer management difficulties and provides the benefit of single adjudication and comprehensive supervision by a single forum.

87.     Finally, Defendant has acted or refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to grant declaratory relief with respect to the Class as a whole.

**COUNT I**
**Violation of The Racketeering Influenced And Corrupt Organizations Act**
**("RICO") 18 U.S.C. § 1962**

88.     Plaintiff and Class Members reallege and incorporate by reference each allegation set forth above as if fully set forth herein.

89.     Defendant MX is an enterprise within the meaning of 18 U.S.C. § 1961(4) because it is a corporation organized under laws of Delaware.

90.     18 U.S.C. § 2320(a) provides: "Whoever intentionally traffics in…services and knowingly uses a counterfeit mark… in connection with such… services… shall be punished." Trafficking in counterfeiting services under 18 U.S.C. § 2320 is listed as a type of "racketeering activity" under RICO, 18 U.S.C. § 1961(1).

91.     Defendant MX has engaged in a pattern of racketeering activity.  MX has repeatedly violated 18 U.S.C. § 2320(a) by trafficking counterfeit marks of financial institutions in connection with its bank account linking services by using such counterfeit marks on fake login screens on various FinTech apps, including, but not limited to, Lexington Law and Countabout.

92.     A counterfeit mark is defined as "a spurious mark (i) that is used in connection with trafficking in any… services (ii) that is identical with… a mark registered on the principal register in the United States Patent and Trademark Office and in use (iii) that is… used in connection with the… services for which the mark is registered with the United States Patent and Trademark Office… (iv) the use of which is likely to cause confusion, to cause mistake, or to deceive."  18 U.S.C. § 2320(f)(1).

93.     As shown in Figures 7 through 13, above, Defendant MX used counterfeit marks under 18 U.S.C. § 2320(f)(1) by (i) using marks on login pages in connection with MX's bank account linking service, (ii) the marks MX used were identical with marks owned by financial institutions that were registered on the principal register, (iii)  MX's use of its marks were in connection with the same services for which the marks owned by financial institutions were

1 registered on the principal register for—namely, Class 36 services, which include financial,

2 monetary, and banking services, and financial information, data, advice, and consultancy services,

3 (iv) MX's use of these identical marks were likely to, and did in fact, cause confusion, mistake and

4 deception.

5       94.    Defendant MX intentionally trafficked in counterfeit marks by repeatedly using

6 them on its various login screens, as exemplified in Figures 7 through 13, above.  MX knew the

7 marks it was using were identical to those of other financial institutions.  MX knew its use of these

8 identical marks was likely to cause confusion and make people mistakenly believe the login screen

9 screens were on the real financial institution's website.  Indeed, confusing and deceiving FinTech

10 app users into believing they were interacting with the financial institutions in question was the

11 entire point of MX's actions.

12       95.    As described herein, Defendant MX has engaged in a pattern of racketeering

13 activity by repeatedly using these counterfeit marks on fake login screens on various FinTech apps.

14       96.    This racketeering activity had an effect on interstate commerce, as MX collected

15 bank account usernames and passwords from Plaintiff and Class members throughout the United

16 States and sold financial data and insights about Plaintiff and Class members to companies

17 throughout the United States and beyond.

18       97.    Plaintiff and Class members are "persons" under 18 U.S.C. § 1961(3).

19       98.    Plaintiff and Class members were injured by Defendant MX's actions as described

20 above.  This injury included the loss of their regulatory indemnification rights by handing over

21 their bank account credentials to a third-party, the loss over the economic value of their financial

22 data, and increased risk of identity theft, which necessitates ongoing costly credit monitoring

23 services.

24       99.    But for Defendant MX's action, Plaintiff and Class members would not have

25 suffered these injuries.

26       100.    Plaintiff and Class members' injuries arising out of their disclosure of their bank

27 login credentials to Defendant MX was proximately caused by Defendant MX's trafficking in

28 counterfeiting bank trademarks.  There is a direct relationship between Plaintiff and Class

members' injuries and Defendant MX's conduct. There is no intervening cause that contributed to Plaintiff and Class members giving Defendant MX their bank account usernames and passwords. The sole cause was MX's trafficking of counterfeit marks. Indeed, such confusion and mistaken provision of bank account credentials is reasonably foreseeable and the natural consequence of trafficking in counterfeit bank marks. And by law, the loss of indemnification rights for electronic fund transfers is directly tied to the provision of one's bank account credentials. See 12 C.F.R. §§ 1005.2(m) and 1005.6(b). Moreover, the increased risk of identity theft, and the loss of control of valuable financial data is also directly tied to the provision of one's bank account credentials to third-parties.

**COUNT II**
**Violation of The California Anti-Phishing Act**
**Cal. Bus. & Prof. Code § 22948.2**

101.    The California Anti-Phishing Act of 2005 (the "Anti-Phishing Act") makes it unlawful to use the Internet "to solicit, request, or take any action to induce another person to provide identifying information by representing itself to be a business without the authority or approval of the business." Cal. Bus. & Prof. Code § 22948.2. "Identifying information" includes bank account numbers, account passwords, and "[a]ny other piece of information that can be used to access an individual's financial accounts." Cal. Bus. & Prof. Code § 22948.1(b). An individual who is adversely affected by a violation of Section 22948.2 may bring an action. Cal. Bus. & Prof. Code § 22948.3(a)(2).

102.    As described herein, Defendant violated the Anti-Phishing Act by representing itself to be Plaintiff and Class members' financial institutions. Defendant fraudulently and deceitfully impersonated those institutions in order to induce Plaintiff and Class members to provide their login credentials to Defendant, as described herein. Defendant did so without obtaining the authority or approval of each financial institution.

103.    Plaintiff and Class members have been adversely affected by Defendant's violations of the Anti-Phishing Act because Defendant engaged in this deceitful conduct in order to extract from Plaintiff and Class members their login credentials and all of the transaction history and other

1    data accessible with those credentials, as detailed above.  Defendant caused actual injury, harm,

2    damage and loss to Plaintiff and Class members for the reasons described herein.

3        104.    Plaintiff and Class members are entitled to relief under Cal. Bus. & Prof. Code §

4    22948.3(a)(2), including $5,000 per violation; which should be trebled because Defendant engaged

5    in a pattern and practice of violating § 22948.2 (indeed, it is the essence of Defendant's business

6    model); an injunction against further violations; costs of suit and reasonable attorney's fees; and

7    such other relief as the Court may deem just and proper.

8    **PRAYER FOR RELIEF**

9        **WHEREFORE**, Plaintiff, individually and on behalf of the members of the Class and

10    Subclass, prays for judgment as follows:

11
12    (a)    Declaring this action to be a proper class action and certifying Plaintiff as the representative of the Classes, and Plaintiff's attorneys as Class Counsel to represent the Class;

13
14    (b)    An order declaring Defendant's conduct violates the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 and 2320, and the California Anti-Phishing Act, Cal. Bus. & Prof. Code § 22948.2;

15
16    (c)    Awarding trebled actual damages to each member of the Nationwide Class;

17    (d)    Awarding $15,000 in trebled statutory damages to each member of the California Class;

18
19    (e)    Awarding Plaintiff and Class and Subclass Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts, and reimbursement of Plaintiff's expenses; and

20
21    (f)    Granting such other and further relief as the Court may deem just and proper.

22    **JURY TRIAL DEMANDED**

23        Under Federal Rule of Civil Procedure 38, Plaintiff, individually and on behalf of the

24    members of the Classes, exercises his right under the Seventh Amendment to the United States

25    Constitution and demands a trial by jury.

26

27

28

Dated: April 28, 2023                    **BURSOR & FISHER, P.A**.

                                          By:   /s/ *Stefan Bogdanovich*
                                                    Stefan Bogdanovich

                                          Stefan Bogdanovich (State Bar No. 324525)
                                          Brittany S. Scott (State Bar No. 327132)
                                          1990 North California Blvd., Suite 940
                                          Walnut Creek, CA 94596
                                          Telephone: (925) 300-4455
                                          Facsimile:  (925) 407-2700
                                          E-mail: sbogdanovich@bursor.com
                                                    bscott@bursor.com

                                          Philip L. Fraietta (*pro hac vice* forthcoming)
                                          888 Seventh Avenue
                                          New York, NY 10019
                                          Telephone: (212) 989-9113
                                          Facsimile: (212) 989-9163
                                          E-Mail: pfraietta@bursor.com

                                          *Attorneys for Plaintiff*